PEDRO JUAN SERRALLES GALIANO, Plaintiff and Appellant, *v.* SECRETARY OF THE TREASURY OF PUERTO RICO, Defendant and Appellee.

No. 11811. Decided November 24, 1961.

*Víctor Gutiérrez Franqui, Luis F. Sánchez Vilella, C. Morales, Jr., Vicente Zayas Pizarro,* and *Benjamín Ortiz* for appellant. *José Trías Monge, Secretary of Justice,* and *Manuel J. Medina Aymat, Assistant Secretary of Justice,* for appellee. *James R. Beverley, R. Castro Fernández,* and *Francisco Castro Amy* as amici curiæ.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

In order to carry out the government program announced by the administration which took over the destinies of the country immediately after the general elections of 1940, and in order to check the inflation which was being felt as a result of the outbreak of hostilities in Europe in 1939, the Legislative Assembly of Puerto Rico adopted a fiscal policy aimed at obtaining greater income for the public treasury. In the sphere of income tax, this policy was materialized through legislation increasing the rates, reducing the credits and the deductions allowed from the gross income, eliminating avenues of escape, and establishing a more effective and

strict administration of the law.[1] Three measures in particular are of utmost importance in the final disposition of this suit.

Act No. 31 of April 12, 1941 (Sess. Laws, p. 478) amended § 4 (a) so that "the term 'earnings' shall mean any share or right to share in a partnership, which belongs to its partners or participants in each taxable year out of the earnings or profits of any partnership." Prior to that date the corresponding portion of that section, in defining profits, read "any distribution made by a partnership to its members and participants," and had been construed in *Behn* v. *Domenech, Treas.*, 49 P.R.R. 790 (1936), as not including profits declared by a partnership which had not been distributed to its partners. The purpose of the amendment was to tax the profits pertaining to a member which, although not distributed, had been declared. *Buscaglia, Treas.* v. *Tax Court*, 69 P.R.R. 700 (1949), *affirmed*, 181 F.2d 823 (1950) ; 70 P.R.R. 364 (1949) ; *Descartes, Treas.* v. *Tax Court*, 71 P.R.R. 230 (1950). This amendment was made retroactive to January 1, 1940. Section 24 (b) was also amended in order to require, with retroactive effect to that date, the filing of a joint return by husband and wife, *Ballester* v. *Court of Tax Appeals*, 61 P.R.R. 460 (1943). Up to this time election could be made to file separate returns or a joint return. See *Casal* v. *Sancho, Treas.*, 53 P.R.R. 609 (1948).

Act No. 23 of November 21, 1941 (Sp. Sess. Laws, p. 72) amended § 13 (a), relative to the additional tax, and increased

---

[1] A similar situation occurred in the United States in connection with family partnerships, which appeared as a taxpayer's measure to split his tax liability. Dierberger, *Income Tax Splitting and Family Partnerships*, 30 Taxes 515 (1952).

substantially the tax rates.[2] The effective date of this Act was made retroactive to January 1, 1941.[3]

The agricultural and industrial civil partnership "Sucesión J. Serrallés" was organized in 1914 by deed No. 33 of April 11, executed before Notary Francisco Parra Capó. Although it was a regular full partnership, in the partnership contract it was agreed that it would be administered by a board of directors composed of not more than three partners or proxies to be elected as provided in the twentieth clause,

---

[2] In order to have a complete picture of the impact in the amount of the tax payable as a result of the amendment contained in Act No. 23 of 1941, we present the following comparative picture:

| Net Income | Additional Tax up to Dec. 31, 1940 (Act No. 2 of May 25, 1939) | | Additional Tax as of January 1, 1941 (Act No. 23 of Nov. 11, 1941) |
|---|---|---|---|
| Up to $5,000 | | ——— | |
| Up to $7,000 | | ——— | 3% on $ 5,000 |
| $7,000 to 10,000 | 3% | on excess of $ 7,000 | 5% on $ 7,000 |
| 10,000 to 14,000 | 5% | on excess of $10,000 | 7% on $10,000 |
| 14,000 to 16,000 | 7% | on excess of $14,000 | 10% on $14,000 |
| 16,000 to 18,000 | 9% | on excess of $16,000 | 13% on $16,000 |
| 18,000 to 20,000 | 10% | on excess of $18,000 | 17% on $18,000 |
| 20,000 to 22,000 | 11% | on excess of $20,000 | 21% on $20,000 |
| 22,000 to 24,000 | 12% | on excess of $22,000 | 25% on $22,000 |
| 24,000 to 26,000 | 13% | on excess of $24,000 | 29% on $24,000 |
| 26,000 to 28,000 | 14% | on excess of $26,000 | 32% on $26,000 |
| 28,000 to 30,000 | 15% | on excess of $28,000 | 35% on $28,000 |
| 30,000 to 34,000 | 16½% | on excess of $30,000 | 38% on $30,000 |
| 34,000 to 36,000 | 17½% | on excess of $34,000 | 41% on $34,000 |
| 36,000 to 38,000 | 18½% | on excess of $36,000 | 44% on $36,000 |
| 38,000 to 42,000 | 20% | on excess of $38,000 | 47% on $38,000 |
| 42,000 to 44,000 | 21% | on excess of $42,000 | 50% on $42,000 |
| 44,000 to 46,000 | 22% | on excess of $44,000 | 53% on $44,000 |
| 46,000 to 52,000 | 24% | on excess of $46,000 | 54% on $46,000 |
| 52,000 to 58,000 | 26% | on excess of $52,000 | 55% on $52,000 |
| 58,000 to 64,000 | 28% | on excess of $58,000 | 56% on $58,000 |
| 64,000 to 70,000 | 30% | on excess of $64,000 | 57% on $64,000 |
| 70,000 to 76,000 | 32% | on excess of $70,000 | 58% on $70,000 |
| 76,000 to 82,000 | 34% | on excess of $76,000 | 59% on $76,000 |
| 82,000 to 88,000 | 36% | on excess of $82,000 | 60% on $82,000 |
| 88,000 to 94,000 | 38% | on excess of $88,000 | 61% on $88,000 |
| In excess of 94,000 | 40% | | 62% |

[3] The constitutionality of the retroactive increase in the tax rates was upheld in *Ballester* v. *Court of Tax Appeals*, 61 P.R.R. 460 (1943), *aff'd*, 142 F.2d 11 (1944), *cert. denied*, 323 U.S. 723 (1944). *Cf.* as to retroactivity of inheritance tax, *González* v. *Treasurer of P. R.*, 76 P.R.R. 247 (1954).

who would have the powers and attributes specified therein. By the passing of time the entity underwent changes and alterations both as respects its partners—as a result of the conveyance of shares by sale and gift and by the death of the original partners—and as respects its administrative structure. Consequently, by deed No. 15 of August 21, 1940 executed before Notary Vicente Zayas Pizarro, the partnership regime was modified so as to conform it to the situation prevailing at that time.

On that date all the partners who in their capacity as full partners composed the partnership came from the three branches of the Serrallés family, who since the past century had been engaged in an identical enterprise: the Serrallés-Sánchez, whose stem was Juan Eugenio Serrallés Pérez; the Wirshing-Serrallés, whose stem was Julia Serrallés Pérez widow of Wirshing; and the Serrallés-Tristani, whose stem was and is at present Pedro Juan Serrallés Galiano, the appellant herein. Among other things, there was consecrated a right of preference in favor of the partners in the event of sale or transfer of the corresponding share by any of its members, as well as in the event of exchange, mortgage, or any other form of alienation; it was provided that any third party who could join the partnership upon acquiring the share of one of the managing partners would have no right to become a managing partner; there were designated three managing partners, in representation of each one of the three branches of the Serrallés family, and although they were permitted to delegate the exercise of the administrative functions, the authorization was limited to other members of the same branch; appellant Pedro Juan Serrallés Galiano was authorized to delegate to his wife Rosario Tristani and to his children Pedro J., Rosario June, and Juan Serrallés Tristani, "but, bearing in mind that these three are minors, such designation shall not be effective until anyone of them has reached majority either by attaining 21 years of age, or

by emancipation as provided by law"; [4] on December 31, 1939 there was allotted to Serrallés Galiano a share in the partnership capital amounting to $1,035,313.16 out of the total of $3,500,000, *i.e.*, 29.58037604 per cent, and an identical share in the accumulated reserve—undistributed profits—of $947,711.85, *i.e.*, an additional amount of $280,336.73; it was provided that each partner would have four accounts on the accounting books: (1) a capital account, to which the share in the partnership would be transferred; (2) a private account, in which "the credits or debits on account of profits" would be entered; (3) an expense account, *i.e.*, an account of personal expenses, the balance of which would be transferred to the private account after striking the general balance; and (4) any other account provided by the managing partners; and it was provided that the profits declared in each general balance would be credited to the reserve fund, unless it was agreed to distribute the same in whole or in part to the partners in not less than 60 per cent of the share in the partnership.

On December 26, 1941, the Serrallés-Tristani spouses executed deed No. 44 before Notary Vicente Zayas Pizarro, whereby they donated irrevocably to their three children Pedro Juan, Rosario June, and Juan, the sum of $300,000 out of the partnership capital of "Sucn. J. Serrallés," *i.e.*, in a proportion of $100,000 to each. It was stated that the purpose of the gift was to secure the economic "status" of the donees, who at the time were 17, 14, and 10 years old, were studying, and lived in the company and under the patria

---

[4] In the exercise of the power to delegate granted in the partnership contract, Pedro Juan Serrallés designated as "delegate" his son Pedro Juan Serrallés Tristani, and to that effect executed deed No. 3 of April 12, 1950 before Notary Vicente Zayas Pizarro. At that time the young Serrallés was already 26 years of age. The evidence discloses that the delegator-managing partner was living in the City of Miami, in charge of the business and investments of the Serrallés family in the State of Florida, and that he had little time to devote to the transactions of the partnership Sucn. J. Serrallés.

potestas of the appellant. The donation included any sum which by way of profits would correspond to the amount of the donated capital accruing from the transactions of the partnership in 1941, the balance of which was about to be struck,[5] but it was made clear that the donees did not become thereby managing partners or administrators of the partnership. In the deed in question the parents-donors waived in favor of their children the legal usufruct corresponding to them, clarifying, however, that this waiver did not affect their relations—obligations, duties, and rights—with respect to the minors, such as the administration of their property and their education and support, for which they reserved sufficient property. The former District Court of Ponce designated the minors' maternal grandmother guardian ad litem, and she appeared in the proper deed for the purpose of accepting the donation as required by the applicable legal provisions.

Eighteen months after the donation was made, the District Court of Ponce authorized a loan in the sum of $37,200 in favor of Serrallés Galiano out of the minors' money. In the petition made by the minors' father he alleged that this transaction was beneficial and convenient because the children's capital, which remained idle, without producing rent or profits, would earn interest at 2 per cent per annum, as would be the case if it had been deposited in a saving account in a banking institution, and further, because the amount of the loan would be devoted to take care of personal and family needs, including expenses incurred in the support and education of the three minors.

During the three years in controversy the appellant paid personally the amount of tax corresponding to his three children. The sums paid on that account were allowed in the minors' account on the partnership books. There is no specific

---

[5] Five days later each donee was credited with the sum of $5,714.29 as share in the profits of the current year, or a total of $17,142.87.

evidence of the minors' acceptance as members of the partnership, but such is the inference from all the attendant circumstances,[6] particularly from the fact that the minors were required to sign, together with the other partners, a mortgage contract in favor of the firm John Hancock Life Insurance Co. *Cf. Perales* v. *Sampayo et al.*, 36 P.R.R. 808 (1927). The plaintiff attempted to establish that it was a current practice in the Serrallés family to make gifts in favor of the descendants. The trial court made no conclusion on this point evidently because of the fact that the examples given are, as to their circumstances, clearly distinguishable from the situation under consideration, since the question was not one of gratuitous gifts in favor of minors (onerous gift made by Pedro Juan Serrallés Pérez in favor of his son Pedro Juan Serrallés Galiano, by deed No. 116 of August 30, 1921, executed before Notary Francisco Parra), and further, that it constituted an anticipatory distribution of inheritance which comprised the donor's full share in the partnership [7] (gift made by Mercedes Pérez widow of Serrallés by deed No. 34 of April 11, 1914, executed before Notary Francisco Parra in favor of her five children and her grandson Pedro J. Serrallés Galiano).

The Secretary of the Treasury included the earnings and profits of the partnership Sucesión J. Serrallés which had been credited to minors Serrallés-Tristani as income received by appellant Pedro Juan Serrallés Galiano, and consequently

---

[6] We are convinced that the clauses bearing on the membership of new partners and on preference of acquisition to which we have made reference, were rather intended to prevent the possible membership of strangers, that is, persons not related by blood or marriage to the three branches of the Serrallés family. This is what the interesting history of this family partnership reveals.

[7] On the date the donations were made the conveyance was not taxable. It was not until the enactment of Act No. 303 of April 12, 1946 (Sess. Laws, p. 782; 13 L.P.R.A. § 881 *et seq.*), that a tax was levied on donation *inter vivos. Freeman* v. *Noguera, Sec. of the Treas.*, 82 P.R.R. 298 (1961); *Estévez* v. *Registrar*, 67 P.R.R. 337 (1947); *Casalduc* v. *Registrar*, 67 P.R.R. 582 (1947).

assessed deficiencies upon review of the income returns filed by him for the years 1941, 1942, and 1943.

After considering and weighing the evidence, the trial court made a finding of fact to the effect that the gift made by the appellant "had no motive, reason, or purpose other than to evade the resulting tax consequences and the nonpayment by the plaintiff of a greater additional tax through the plan for redistribution or reallocation of income within his family economic unit." For that reason it did not expressly pass upon, as being unnecessary, the defense alleged by the Secretary of the Treasury that since the parents' legal usufruct can not be waived, the interest and profits from the donated property were attributable to the appellant as taxable income.

 Irrespective of whether or not the parents' legal usufruct from the children's property may be waived—a question which we will not pass upon until a more suitable occasion—we can not overlook the fact that the controversy in this appeal is essentially one of fiscal law in the solution of which we must first resort to the applicable provisions and to the fundamental principles governing the matter. *De la Haba* v. *Tax Court; Treas., Int.,* 76 P.R.R. 865 (1954); *Albanese* v. *Secretary of the Treasury,* 76 P.R.R. 302 (1954); *Semanaz* v. *Secretary of the Treasury,* 76 P.R.R. 385 (1954); *González* v. *Secretary of the Treasury,* 75 P.R.R. 864 (1953). We therefore turn to examine some of the established principles in tax law which are closely related to the issues posed.

 Intrafamily transactions must be carefully scrutinized, *Spiesman* v. *Commissioner,* 260 F.2d 940 (C.A. 9, 1958); *Commissioner of Internal Revenue* v. *Reece,* 233 F.2d 30 (C.A. 1, 1956); *Nelson* v. *Commissioner of Internal Revenue,* 184 F.2d 649 (C. A. 8, 1950), particularly when their practical effect is to spread the tax liability among several persons, *Boyt* v. *Commissioner of Internal Revenue,* 209 F.2d

839 (C. A. 8, 1954) ; *Visintainer* v. *Commissioner of Internal Revenue*, 187 F.2d 519 (C.A. 10, 1951) ; *Batman* v. *Commissioner of Internal Revenue*, 189 F.2d 107 (C. A. 5, 1951) ; *Yiannias* v. *Commissioner of Internal Revenue*, 180 F.2d 115 (C. A. 8, 1950). In this connection it is well to consider the source of the transaction, the existing relation between the parties, the immediate effect on the latter's individual tax liability, the disposition of the income received and any other factor which tends to shed light on the true intent and the actual motives underlying the transaction. *Highland Hills Swimming Club, Inc.* v. *Wiseman*, 272 F.2d 176 (C. A. 10, 1959) ; *Finley* v. *Commissioner of Internal Revenue*, 255 F.2d 128 (C. A. 10, 1958) ; *cf. Lucas* v. *Earl*, 281 U.S. 111 (1930) ; which contains the famous phrase of Mr. Justice Holmes that no interpretation will be favored whereby "the fruits are attributed to a different tree from that on which they grow"; *Burnet* v. *Leininger*, 285 U. S. 136 (1932) ; *Helvering* v. *Eubank*, 311 U.S. 122 (1940).

██ ██ Even admitting that the taxpayer may lawfully attempt to limit his tax liability by resorting to the means afforded by the law, *Commissioner* v. *Phillips*, 275 F.2d 33 (C. A. 4, 1960), considering the specific circumstances of the situation under our consideration, it can not be denied that the trial court's conclusion that the purpose of the donation is to escape the new tax rigor implanted by the 1941 legislation is not devoid of reasoning. What appears to be evident is that the only practical effect of the donation is to transfer from the father's tax return to those of his minor children the income which in the form of partnership profits is produced by the donated capital. The control of the conduct of the partnership business is in no way affected; the donees in no way intervene in the partnership management, and they do not practically receive in any form whatever the profits from the capital, since, as we have seen, the latter are credited to them in a personal account opened on the

partnership books, and the only purpose which they served was to be the object of a loan to the father himself under conditions of obvious convenience to the borrower. It is also significant that the generosity of the parents-donors is manifested hardly 35 days after the approval of the measure increasing the tax rates, and which, as in the case of the Act mentioned, is expressly made retroactive to January 1, 1941 to include therein any profits received during that year. All these circumstances amply support the trial court's position. We should therefore respect it. *Spiesman* v. *Commissioner*, 260 F.2d 940 (C. A. 9, 1958); *Feldman* v. *Commissioner*, 186 F.2d 87 (C. A. 4, 1950). As is possibly the case with every transaction of this type, some factors may be considered which point to a contrary solution, but weighing the facts as a whole, the balance is inclined, in our opinion, to support that the decisive motive in this case was to alleviate the tax burden by spreading among several persons the income rightly attributable to a single economic unit. It is proper, therefore, to discard for tax purposes the fiction created and to ignore a refinement of title which may have consequences worthy of recognition in other fields of the law, but not for the purposes aforesaid. *Cf. Finley* v. *Commissioner*, 255 F.2d 128 (C.A. 10, 1958).

▇ Article 225 of Regulations No. 1,[8] invoked by appellant, does not have the effect claimed of permitting in the instant case the declaration by the son in a separate return of the income received by way of profits in the partnership. *Al-*

---

[8] The said article provides that:

"If a minor has been emancipated by his parent, his earnings are his own income, and such earnings, regardless of amount, are not required to be included in the return of the parent. If the aggregate of the net income of a minor from any property which he possesses, and from any fund held in trust for him by a trustee or guardian, and from his earnings in case he has been emancipated, is at least $1,000, or his gross income is at least $5,000, a return as in the case of any other individual must be made by him or by his guardian, or some other person charged with the care of his person or property for him. See article 231. In the absence of proof to the contrary, a parent will be assumed to have the legal right to the earnings of the minor and must include them in his return."

*varez* v. *Sec. of the Treasury*, 80 P.R.R. 15, 30 (1957), in which the second sentence of that article was declared invalid.

In the United States the problem of the allocation of income in family partnerships has been the object of varying interpretation.[9] As a result of the opinions of the Federal Supreme Court in *Commissioner* v. *Tower*, 327 U.S. 280 (1946), and *Lusthaus* v. *Commissioner*, 327 U. S. 293 (1946), the Tax Court and a majority of the district courts urged that, for the purpose of recognizing the spreading of the partnership benefits among different members of the family—husband and wife and parents and children—a contribution be made to the partnership's original capital, and/or a substantial contribution to the conduct or management of the latter, and/or the rendering of "vital services" by the wife or the children. A progeny of over 200 cases followed the opinions cited, and finally, in order to lay down the definitive rule, the Supreme Court further considered the problem in *Commissioner* v. *Culbertson*, 337 U. S. 733 (1949), and stated that an error of emphasis had been committed in the interpretation of its two previous opinions and that the applicable test was to determine whether the parties in good faith and for the genuine purpose of engaging in the conduct of business contributed capital or services to carry on a partnership enterprise. This criterion—fundamentally subjective—required an examination of the circumstances of each particular situation.[10] Finally, in 1951 there was incorporated an express provision in the federal act and in the definition of partnership there was added a sentence to the effect that a person shall be recognized as partner—for tax purposes—in a part-

---

[9] The Income Tax Act of 1954 was taken from the Federal Act of 1939, as amended, but it omitted the provisions on family partnerships. It should also be recalled that in the United States the partnership is tax-free, and that only the income received by a partner by way of profits from his capital or for services in the partnership is taxable.

[10] Notes: Landman, *Family Partnerships and the Reality Test*, 28 Taxes 551 (1950). 17 U. Chi. L. Rev. 503 (1950); 25 N.Y.U.L. Rev. 379 (1950); 28 N.C.L. Rev. 238 (1950); 35 Iowa L. Rev. 98 (1949); 44 Ill. L. Rev. 725 (1949); 98 U. of Pa. L. Rev. 143 (1949).

nership in which capital is a material income-producing factor, whether or not such interest was derived from purchase or gift from any other person. Furthermore, in Supplement F, relative to partnerships, there was added § 191, which substantially admits that the share of the profits corresponding to a partner for his capital contribution is taxable, provided there is allowed a reasonable compensation for services rendered by the donor in the administrative conduct and that the proportional part of these profits do not exceed the relation between the capital contribution and the totality of the partnership capital. See, in general, *Stanback* v. *C.I.R.*, 271 F.2d 514 (C. A. 4, 1959); *Poggetto* v. *United States*, 193 F. Supp. 688 (Cal. 1961); 6 Mertens, Law of Federal Income Taxation, § § 35.08 to 35.18; *Family Partnerships and the Revenue Act of 1951*, 61 Yale L. J. 541 (1952).

Lastly, we wish to invite attention to the fact that the conclusion at which we have arrived refers to the taxable years prior to 1954. We need not, therefore, consider the provisions of the existing law. We have also abstained deliberately from referring to situations in which a trust is involved.

The judgment rendered by the Superior Court, San Juan Part, on October 28, 1954, will be affirmed.